Filed 3/23/21  In re A.A. CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re A.A., a Person Coming Under the Juvenile Court Law. | D078177 |
| IMPERIAL COUNTY DEPARTMENT OF SOCIAL SERVICES, | |
| Plaintiff and Respondent, | (Imperial County Super. Ct. No. JJP03754) |
| v. | |
| V.A., | |
| Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Imperial County, William D. Lehman, Judge.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Office of County Counsel and Kelly Ranasinghe, for Plaintiff and Respondent.

V.A. (Mother) appeals from a combined hearing on (1) her petition filed under Welfare and Institutions Code section 388[1] and (2) selection and implementation under section 366.26. Mother contends the juvenile court erred in denying her petition that requested the return of her daughter, A.A. to her custody. Mother further challenges the court's order terminating parental rights and selecting adoption as A.A.'s permanent plan, arguing that the sibling relationship exception to termination of parental rights applied (§ 366.26, subd. (c)(1)(B)(v)). We conclude the juvenile court did not err on any asserted ground and affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

In response to a child welfare referral, the Imperial County Department of Social Services (Department) began an investigation of 22-month-old A.A. and her five-year-old half brother.[2] The half brother lived with his father on weekdays and with Mother and A.A. on weekends. The half brother disclosed to investigators that Mother smoked a substance out of a pipe in the children's presence; she failed to prepare food for him, and he was hungry in her home; Mother did not do any cleaning; and she fell asleep during the day, leaving him unsupervised and having to care for his little half sister. The half brother also told the Department that Mother recently tried to "yank" him out of a moving vehicle while she was carrying A.A., Mother once tried to hit his father, and he had seen A.A.'s father (Father) hit Mother before in the nose.

---

[1]   Further unspecified statutory references are to the Welfare and Institutions Code.

[2]   Mother's appeal relates only to A.A., and our discussion of other children is accordingly limited.

When questioned by Department personnel, Mother admitted that she (1) used methamphetamine " 'on and off' " for the past three years, including within the last month[3]; (2) smoked marijuana " 'every other day' "; and (3) she knowingly used these drugs while pregnant. She was then 23 weeks pregnant. Mother acknowledged a history of domestic violence in her past relationship with her son's father. She further admitted that Father was a methamphetamine user and that he sometimes visited the home on weekends. Father was homeless, and his current whereabouts were unknown.

*First Detention and Removal*

In April 2017, the Department took the children into protective custody and filed petitions on their behalf based on a substantial risk of serious physical harm from Mother's drug use and domestic violence as well as Father's failure to provide support (§ 300, subd. (b)(1) & (g)). Mother pleaded no contest to the petition's allegations. The court found the allegations true, declared the children to be dependents, removed A.A. from parental custody, and ordered reunification services for Mother. A.A. was placed in foster care. The half brother was placed with his nonoffending father, who was given sole legal and physical custody over the child, and the court terminated its jurisdiction over the half brother.

Over the next six months, Mother made little or no progress on her case plan. In June 2017, she gave birth to a baby girl (sibling). In August, September, and October, Mother tested positive for illicit drugs. In December

---

[3] Mother later admitted to social workers that she smoked and snorted methamphetamine "regularly," "a lot," and "everywhere," from 2014 to 2017.

3

2017, she entered an inpatient drug treatment program. The court continued Mother's reunification services for another six months.

In March 2018, Mother completed her inpatient drug treatment program and transitioned to a sober living home. She was also having positive supervised visits with A.A. every other week. Mother subsequently had another positive test for methamphetamines and admitted she had recently associated with a drug user. The Department was also concerned that Mother was continuing to maintain contact with Father, who was untreated and absent from the dependency proceedings.

By the 12-month review hearing in late April 2018, the Department believed that Mother had made adequate progress in her case plan and accordingly requested discretion to return A.A. to Mother's custody under a family maintenance plan. Mother continued to live in a sober living home, was returning negative drug tests, participated in services, and obtained a job. The juvenile court granted the Department's request, and A.A. was returned to Mother's care.

For about the next seven months, A.A. and her sibling lived with Mother until four-year-old A.A. was ultimately removed from Mother's custody, again. Various troubling events transpired. While living with Mother, A.A. tested positive for methamphetamines twice, in August and September 2018, after Mother allowed A.A. to be cared for by drug-using relatives. The Department also discovered that Mother allowed Father, who was another known drug user, to visit the family twice at her apartment. Mother only admitted to Father's visits when the Department confronted her with her own dated social media posts containing pictures of him in her apartment. By October, Mother was using marijuana again. Then, in November, Mother invited yet another known drug user to her home so that

4

he would supply her with marijuana. This drug supplier did not bring the requested marijuana, but instead, compelled her to smoke methamphetamine with him four times and then raped her, all while her young children were unsupervised in a different room.

When social workers visited Mother's home after the November incident, they found marijuana and related paraphernalia in a location of the home that could be accessed by the children.

*Second Detention and Removal*

In late November 2018, the Department petitioned under section 387 to remove A.A. from Mother's care. The juvenile court detained the child out of the home. In early December 2018, A.A. was placed with a nonrelative extended family member (NREFM), Monica, where she would continuously reside thereafter. Monica was the girlfriend/fiancée of Mother's cousin. A.A.'s sibling was placed with Monica as well.

The Department's section 387 and disposition reports recommended that the court make a true finding on the supplemental petition, remove A.A. from parental care, terminate Mother's services, and schedule a selection and implementation hearing under section 366.26. After A.A.'s second detention, Mother continued to test positive for methamphetamines, amphetamines, and marijuana. At the hearing on the section 387 allegations in March 2019, Mother admitted that she had experienced a drug relapse and submitted to the court's jurisdiction. The court found that its prior disposition had been ineffective in the protection of A.A. At the dispositional hearing in July 2019, the court removed A.A. from Mother's care, terminated services, and scheduled a section 366.26 hearing.

5

After the dispositional hearing, Mother entered KIVA, a residential drug treatment program. She completed the program and certain parenting classes by October 2019 and relocated to a sober living home.

*Mother's Section 388 Petition*

In November 2019, Mother petitioned under section 388 for return of A.A. and the sibling to her care.[4] As changed circumstances, Mother alleged she had been diagnosed with schizophrenia and bipolar disorder and was compliant with taking medication, she was continuing drug treatment, and continuing to produce negative drug tests. Mother asserted it was in the children's best interests to return to her care because she was "their mother" and she had "demonstrated a positive effort by entering a residential [drug treatment] program to ensure the safe return of her children."

The Department's reports consistently noted that A.A. was doing well in her placement. A.A. became fully toilet trained. Her communication skills gradually improved though she still needed speech services. She attended preschool and received appropriate services for behavioral issues. A.A. was diagnosed with autism and began seeing a psychologist. In January 2020, the Department reported that A.A. was thriving in Monica's home. A.A. was strongly bonded to Monica, who, together with Mother's cousin, were prepared to adopt A.A.[5]

_____

[4]    As the juvenile court and parties were aware, the sibling's case was in a different stage than A.A.'s case. When she filed her section 388 petition, Mother was still in the reunification phase with the sibling, while A.A. was in the permanency planning phase.

[5]    The Department noted, in one line of its report, that Monica was concerned over A.A. being separated from her two-year-old sibling "as the bond between the two is strong." There is no elaboration on this sentiment. There are also no descriptions in the record about interactions between the

The Department prepared a report in response to Mother's section 388 petition, commending her positive life changes but noting various circumstances still in flux. The Department did not believe returning A.A. to Mother would be in the child's best interests.

The Department additionally filed its section 366.26 report, recommending termination of parental rights and adoption as A.A.'s permanent plan. Although Mother had supervised visits with A.A. every other week, the child was very strongly bonded to Monica, who she called "mom" and who had been A.A.'s caregiver for 14 months by then. Monica was meeting all of A.A.'s needs and was committed to adopting her.

Subsequently in 2020, Mother moved to transitional housing and then, around June, into her brother's house. After a few weeks at her brother's house, Mother relocated to a sober living home. The assigned social worker reported that Mother was regularly visiting with A.A., and during the COVID-19 pandemic, was having video calls with her. A.A. was continuing to do "exceptionally well" in her placement with Monica.

For various reasons, including the pandemic, the contested hearing on Mother's section 388 petition was continued several times and finally held in combination with the section 366.26 hearing.

*Contested Sections 388 and 366.26 Hearing*

At the combined section 388 and 366.26 hearing in October 2020, the court received in evidence, without objection, numerous Department reports and the section 388 petition. In addition, the court heard testimony from Mother, her sober living house manager, and social workers Luis Castro and Julietta Figueroa.

---

two children. In contrast, the Department's reports discuss in significant detail how A.A.'s primary attachment was to Monica.

Mother testified that she had completed her services except for a 52-week domestic violence and anger management course, for which she had taken about 20 of the 52 required classes. Mother was then residing in a sober living house. She admitted that she had been addicted to methamphetamine but had been "clean" since April 2019. According to Mother, the children could temporarily stay with her at the sober living facility while she transitioned to her own apartment.[6] She was also working at a gas station as a cashier. Due to COVID-19 restrictions, Mother was currently visiting with A.A. about once monthly in person, and they had weekly video calls. On cross-examination, Mother agreed that she and Father had had a domestically violent relationship. She also acknowledged that five-year-old A.A. had been placed with her cousin's girlfriend (Monica) for almost two years by then. Mother had not had any overnight visits with A.A. and had no specific training on how to care for an autistic child.

The sober living house manager testified that Mother complied with all the house rules, including clean drug tests. The manager further stated that accommodating children in the sober living home was not guaranteed but done on a "case-by-case basis." In the manager's experience, the homeowners tried to assist deserving women in the short term, keeping in mind space and other limitations.

---

[6] On direct examination, Mother testified that the children could move in with her at the sober living facility. However, on cross-examination, Mother clarified that the sober living facility was primarily for adult women, but it could accommodate overnight visits with the children while she transitioned to an apartment.

Supervising social worker Castro explained the reasonableness of the Department's requiring Mother to complete a domestic violence and anger management course, considering the protective issues.

Social worker Figueroa testified that Mother's uncompleted course was one on interpersonal violence from the victim's perspective. The social worker was concerned about Mother's initial delays in starting, and resistance to, the program. Mother had experienced incidents of domestic and sexual violence in her life, which in the past, triggered drug use and relapses. If Mother did not learn the appropriate methods of handling these stressful events, Figueroa believed there was a continuing risk of harm to the children.

The parties' counsel made closing arguments. To support her argument that A.A. should be returned to Mother's care, Mother's counsel focused on Mother's bond with A.A. and Mother's near completion of, and expressed intent to complete, all her services. Counsel for A.A. and the sibling (minors' counsel) was opposed to placing the siblings separately. Minors' counsel believed it was in the children's best interests to return to Mother's care together. No party addressed or argued for application of the sibling relationship exception to termination of parental rights.

After considering the evidence and arguments of counsel, the juvenile court declined to return A.A. to Mother's care, found A.A. adoptable, terminated Mother's parental rights, and ordered a permanent plan of adoption. The court prefaced its comments by stating, "I don't think there's been any evidence presented of the nature of the relationship between [the sibling] and [A.A.]." The court was satisfied that Mother's circumstances had changed, but found it was not in A.A.'s best interests to be moved from her stable placement. Noting that A.A. may have "some bond" with Mother, the

9

court decided that the child had a far stronger bond with Monica, and that, in considering A.A.'s need for permanence and stability, it was in her best interests to remain in the home where she had been thriving for the past two years. Regarding the sibling, the court found no substantial risk of detriment in returning her to Mother's care and accordingly did so under a family maintenance plan.

Mother's appeal relating to A.A. followed.

DISCUSSION

I. *Section 388 Petition*

    A. *Legal Principles and Standard of Review*

At a hearing on a section 388 petition seeking to change a child's placement, the moving party must show a change of circumstances or new evidence and that the change in placement is in the child's best interests. (§ 388; *In re Stephanie M.* (1994) 7 Cal.4th 295, 317 (*Stephanie M.*).)

We review the juvenile court's ruling on a section 388 petition for abuse of discretion. (*Stephanie M.*, *supra*, 7 Cal.4th at p. 318.) Reversal is appropriate only if we find the court has made an arbitrary, capricious, or patently absurd determination. (*Ibid.*) We do not inquire whether substantial evidence would have supported a different order, nor do we reweigh the evidence and substitute our judgment for that of the lower court. (*Id.* at pp. 318-319.) We ask only whether the court abused its discretion with respect to the order it actually made. (*In re M.H.* (2018) 21 Cal.App.5th 1296, 1305 ["The trial court's determination that the proposed change in placement was not in the child's best interest will not be disturbed unless an abuse of discretion is clearly established."]; *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351.)

10

After reunification efforts have terminated, the juvenile court's focus shifts from family reunification toward promoting the child's needs for permanency and stability. (*In re Marilyn H.* (1993) 5 Cal.4th 295, 309.) " 'A court hearing a motion for change of placement at this stage of the proceedings must recognize this shift of focus in determining the ultimate question before it, that is, the best interests of the child.' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 527 (*J.C.*).) Therefore, "after reunification services have terminated, a parent's petition for either an order returning custody or reopening reunification efforts must establish how such a change will advance the child's need for permanency and stability." (*Ibid.*)

B. *Analysis*

Applying the foregoing principles, we conclude the court did not abuse its discretion in finding that A.A.'s continued placement with, and adoption by, Monica would provide the child with the permanency and stability that was in her best interests. Mother's change of circumstances is essentially undisputed on appeal—she maintained sobriety for 18 months and alleviated the protective issues to the point where the three-year-old sibling could be returned to her care. The court found, however, an insufficient showing that returning A.A. to Mother would be in A.A.'s best interests.

Mother acknowledges she had very serious parenting and protective issues when the case began and for a significant period thereafter. During that time, A.A. was moved through multiple placements. After A.A.'s first detention, Mother participated in drug treatment programs, including a residential treatment program, which proved unsuccessful. She remained unprotective of her children—three-year-old A.A. tested positive, *twice*, for methamphetamines while in Mother's care; was exposed to multiple known drug users; and was left unsupervised. After A.A.'s second detention, Mother

11

relapsed on drugs.  She required a second residential drug treatment program.  Mother had not yet completed her classes on interpersonal violence by the time of hearing, which was not ideal.  Further, between 2019 and 2020, Mother's housing situation was in a state of flux; she moved in and out of treatment programs, sober living homes, and a family member's home.  She was on the verge of moving again and had not yet had overnight visits with the children.  Although Mother was making positive changes in her life, she still had uncertain times ahead of her.

By contrast to the instability A.A. experienced in Mother's care, she was thriving in the care of NREFM Monica.  A.A. was only five years old, and Monica fulfilled a parental role in her life for almost two of those five years.  Monica cared for A.A. on a daily basis, meeting all her needs.  A.A. was strongly bonded to Monica, who was also well acquainted with Mother and other family members.  A.A. is a child with special needs, being autistic and having speech impairments.  The importance of keeping her in a steady placement, with consistent access to services and special education, cannot be overstated.

Mother points to her visits with A.A. as a reason why the child should have been returned to her care.  However, the juvenile court explicitly reflected on this factor and noted that A.A. was more strongly bonded to Monica.  Substantial evidence supports the court's determination.  A.A. had sought out Monica as her "mom" for the last two years, during a time when A.A. could better communicate, socialize, and form memories.  (Cf. *In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 [significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection, and stimulation, typically arising from day-to-day interaction, companionship and shared experiences].)

Mother also argues that A.A.'s need for permanency and stability would be enhanced by being placed with her sibling. Like the juvenile court, we note that the record contains very little information regarding the nature of the relationship between A.A. and her sibling. We know their ages (five and three years old) and that they lived together for about the last two and a half years. Assuming the sisters had a loving relationship, on the record before us we have no reason to believe that their relationship will cease. Mother recommended the children's placement with Monica, and Monica is an NREFM. Given their family connection, we may reasonably infer that the children will continue seeing each other, perhaps quite frequently, and that both young children will be relatively unaffected by being separately placed. For a related discussion of the sibling relationship exception to termination of parental rights, see section II., *post*.

Moreover, minors' counsel argued at trial for joint return of the siblings to Mother's care. The juvenile court considered the separation issue, and on balance, believed it was in A.A.'s best interests to remain in her safe, stable placement. We are satisfied the court properly considered that A.A.'s and the sibling's cases were in different stages. Mother's reunification efforts with the sibling were still underway, and of course, could ultimately fail. A.A.'s primary attachment was to her caregiver Monica. Mother has not established that the court abused its discretion in deciding that it was in A.A.'s best interests to remain in Monica's care under a plan of adoption. (*J.C.*, *supra*, 226 Cal.App.4th at p. 526 [after termination of reunification services, court must shift its focus to the needs of the child for permanency and stability].)

13

II. *Sibling Relationship Exception*

Mother argues that the juvenile court erred in selecting adoption as A.A.'s permanent plan because the sibling relationship exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(v)) applied. The Department responds that Mother presented no evidence that adoption will cause a substantial interference in the sibling relationship. We agree with the Department.

A. *Legal Principles*

If a juvenile court finds that a child is likely to be adopted, adoption must be ordered unless there is a "compelling reason" to apply one of the statutorily enumerated exceptions. (§ 366.26, subd. (c)(1)(B).) One exception is based on a sibling relationship, which may apply when, "[t]here would be substantial interference with a child's sibling relationship, taking into consideration the nature and extent of the relationship, including, but not limited to, whether the child was raised with a sibling in the same home, whether the child shared significant common experiences or has existing close and strong bonds with a sibling, and whether ongoing contact is in the child's best interest, including the child's long-term emotional interest, as compared to the benefit of legal permanence through adoption." (§ 366.26, subd. (c)(1)(B)(v).)

Employing a two-step process, the juvenile court first determines whether terminating parental rights would substantially interfere with the sibling relationship. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 952 (*L.Y.L.*).) If this first requirement is met, "the court is then directed to weigh the child's best interest in continuing that sibling relationship against the benefit the child would receive by the permanency of adoption." (*Ibid.*; § 366.26, subd. (c)(1)(B)(v).)

14

The parent opposing adoption has the burden of proving the statutory exception for sibling relationships applies. (*In re Daniel H*. (2002) 99 Cal.App.4th 804, 813.) This is considered "a heavy burden." (*Ibid*.) The authors of the legislation adding the sibling relationship exception envisioned that its applicability would " 'likely be rare,' " meaning "that the child's relationship with his or her siblings would rarely be sufficiently strong to outweigh the benefits of adoption." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 950.)

We review the court's factual findings underlying the sibling relationship exception for substantial evidence. (*In re Isaiah S.* (2016) 5 Cal.App.5th 428, 438; *In re D.O.* (2016) 247 Cal.App.4th 166, 174 (*D.O.*).)

B. *Analysis*

Based on our review of the record, Mother did not argue for application of the sibling relationship exception to termination of parental rights at trial. The issue of separately placed siblings was only raised by minors' counsel in the context of Mother's section 388 petition. As to that issue, the juvenile court remarked, "I don't think there's been any evidence presented of the nature of the relationship between [the sibling] and [A.A.]." The same evidence (or lack thereof) underlies both the section 388 and section 366.26 issues. In any event, we agree with the Department's position that Mother has not met her burden of proving that the statutory exception applies.

"To show a substantial interference with a sibling relationship the parent must show the existence of a significant sibling relationship, the severance of which would be detrimental to the child. Many siblings have a relationship with each other, but would not suffer detriment if that relationship ended. If the relationship is not sufficiently significant to cause detriment on termination, there is no substantial interference with that relationship." (*L.Y.L.*, *supra*, 101 Cal.App.4th at p. 952.) Here, there is no

substantial evidence in the record that terminating parental rights will substantially interfere with the sibling relationship or that severing A.A.'s relationship with her sibling will cause detriment.

Mother argues that a substantial interference is "assured" due to the sibling's placement with Mother while A.A. remains placed with Monica. We cannot *speculate* or *assume* that there will be a substantial interference in the relationship. (*D.O.*, *supra*, 247 Cal.App.4th at p. 176 [reiterating that it is appellant's burden to establish a substantial interference, not the child welfare agency's burden to prove there is not].) A.A. may still see her sibling very frequently. Mother admits that A.A. regularly visited her sibling when she was placed in foster care and the children's bond continued to develop during that time. We must assume those circumstances will continue. Thus, the court did not err in terminating parental rights and ordering a plan of adoption.[7]

---

[7] Since Mother did not establish that terminating parental rights will substantially interfere with the sibling relationship, we have no need to address whether the child's relationship with her sibling was strong enough to outweigh the benefits of adoption.

## DISPOSITION

The orders denying Mother's Welfare and Institutions Code section 388 petition and terminating parental rights are affirmed.

HUFFMAN, J.

WE CONCUR:

McCONNELL, P. J.

GUERRERO, J.